UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NICHOLAS SORRENTINO,

                                      Petitioner,

                    -against-

THOMAS LAVALLEY, Superintendent, Clinton
Correctional Facility,

                                      Respondent.

---

12-CV-7668 (VSB) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE VERNON S. BRODERICK, U.S.D.J.:**

    *Pro se* petitioner Nicholas Sorrentino ("Petitioner") has filed a petition in this Court for a

writ of habeas corpus under 28 U.S.C. § 2254 (Notice of Petition for a Writ of Habeas Corpus

Pursuant to 28 U.S.C. § 2254, dated Oct. 3, 2012 ("Pet.") (Dkt. 2)), following his conviction by a

jury, on July 17, 2009, for Murder in the Second Degree, under N.Y. Penal Law § 125.25(1).

Petitioner is currently incarcerated at Clinton Correctional Facility, in Dannemora, New York,

where he is serving an indeterminate prison term of 25 years to life.  (Pet., at 1.)

    Petitioner challenges his conviction on six grounds:  (1) that the hearing court should

have suppressed evidence and statements obtained from Petitioner as a result of an unlawful

arrest; (2) that the trial court should have suppressed historical cell-site location data, or, at

minimum, conducted a *Frye* hearing with respect to the introduction of such evidence;[1] (3) that

certain hearsay statements made by the decedent and a medical examiner were erroneously

admitted, resulting in a violation of Petitioner's constitutional rights; (4) that the trial court's

---

[1] In New York, the standard for admissibility of novel scientific evidence is derived from
*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which requires that such evidence be based
on a principle or procedure that has gained general acceptance in the relevant scientific
community.  *See People v. LeGrand*, 8 N.Y.3d 449, 457 (2007).

*Sandoval* ruling denied him a fair trial;[2] (5) that the trial court's failure to give a circumstantial-evidence instruction denied him a fair trial; and (6) that his sentence was excessive. (*See generally* Pet.) Respondent Thomas Lavalley, Superintendent of Clinton Correctional Facility ("Respondent"), argues that Petitioner's claims should be dismissed as procedurally barred and/or for lack of merit. (*See generally* Answer and Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, dated Apr. 2, 2013 ("Resp. Answer and Mem.") (Dkt. 10).) For the reasons set forth below, I recommend that the Petition be dismissed in its entirety.

## BACKGROUND

### A.   Factual Background

Based on the transcript of Petitioner's trial, Petitioner was convicted and sentenced for the murder of Jose Raul Prieto ("Prieto"), whose body was discovered on May 16, 2007, in his home on East 35th Street in Manhattan. (Respondent's Appendix, filed Apr. 4, 2013 ("App'x"),[3] at 619, 688-89.) From the early 1970s until about five years before the end of his life, Prieto, who was gay, would travel to a particular area in New Jersey to meet ostensibly straight men. (*Id.*, at 678-79, 904-05.) Prieto would bring these men back to his apartment in Manhattan to have sex, in some cases paying for their company or for sexual favors. (*Id.*) In the 1990s, Prieto met Petitioner, and the two began a romantic and sexual relationship that lasted for several years.

---

[2] Under *People v. Sandoval*, 34 N.Y.2d 371, 374-75 (1974), a criminal defendant, before deciding whether to testify at trial, may seek an advance ruling from the court as to whether the prosecution may use evidence of prior criminal acts for impeachment purposes.

[3] Respondent's Appendix consists of transcripts, state court decisions, and other relevant materials, totaling approximately 2,500 pages. By Order dated April 3, 2013, the Honorable Richard J. Sullivan granted Respondent permission to file an electronic version of the Appendix by submitting a compact disc to the Court, rather than by uploading PDF files to the Docket (Dkt. 12 (Endorsed Letter, dated Apr. 3, 2013)). The Docket reflects that the Appendix was received by the Court on April 4, 2013. (Dkt. 13.)

(*Id*., at 651, 903-04.)  During their relationship, Prieto often provided Petitioner with money and other gifts.  (*Id*., at 651, 906).  At trial, the prosecution presented evidence that Petitioner killed Prieto after the relationship deteriorated and Prieto withdrew his financial support.  (*Id*., at 1440.)

### 1.      Investigation into Prieto's Death

On the evening of May 16, 2007, officers with the New York City Police Department ("NYPD") arrived at Prieto's apartment to investigate a possible homicide.  (*Id*., at 12-13.) When the officers entered the apartment, they found Prieto, who had suffered massive blood loss from the head, lying dead on the bedroom floor.  (*Id*., at 13.)  Investigators observed that Prieto had ligature marks on his neck, and that his throat had been cut.  (*Id*., at 744-45.)  Several items, including a fire extinguisher with dried blood on its base and a soda can found in a garbage container, were removed from the apartment and vouchered.  (*Id*., at 14, 757-60.)  From the bedroom dresser, officers removed a copy of Petitioner's birth certificate, as well as a purchase and sale agreement for a 1997 Acura that was in Petitioner's name.  (*Id*., at 1508-10; 1739-43.)

On the day that Prieto's autopsy was being performed, NYPD detectives received a report that one of Prieto's credit cards had been used at a jewelry store in Fairview, New Jersey.  (*Id*., at 79-80.)  When investigators reviewed surveillance video from that jewelry store, they identified the individual who had used Prieto's credit card as Robert Johnson ("Johnson"), Petitioner's "nephew."[4]  (*Id*., at 80.)  Later, investigators received calls from three of Prieto's friends, who all stated that Prieto had been having "problems" with a man named Nick, with whom Prieto had maintained a relationship.  (*Id*., at 80, 166-67, 175.)  Detectives also recovered two messages

---

[4] Petitioner was once married to a good friend of Johnson's mother, and Johnson had shared a residence with Petitioner for a few months during Johnson's childhood.  (*Id*. at 971-74.) Though the two were not actually related, Petitioner and Johnson regarded each other as "uncle" and "nephew."  (*Id*.)

from Prieto's answering machine that were left by a person named Nick (apparently Petitioner), as well as a message from a man named Frankie Fritto ("Fritto").  (*Id.*, at 81, 167-68.)  Fritto later informed officers that an individual identifying himself as Nick Sorrentino had tried to use one of Prieto's checks to rent an apartment.  (*Id.*, at 82-85.)  When detectives showed him a photo array, Fritto identified Petitioner as the person who had given him the check.  (*Id.*, at 82-83.)  On May 24, 2007, based on this information, the People obtained an order, pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. § 7203(d), and N.Y. Crim. Proc. Law §§ 705.10, 705.30, directing Petitioner's cell-phone provider to turn over historical cell-site location information from May 13, 2007, until the date of the order.  (App'x, at 2137-61.)  After obtaining Petitioner's phone records, the police learned that, on May 14, 2007, two days before Prieto's body was discovered, Petitioner's cell phone had made a call that was transmitted via a cell tower site located within one block of Prieto's apartment.  (*Id.*, at 87-90.)  In June 2007, laboratory analysis showed that Petitioner's DNA profile matched DNA found on the soda can, and that the fire extinguisher recovered from Prieto's apartment contained a mixture of DNA from both Prieto and Petitioner.[5]  (*Id.*, at 93-95; 1829-32.)  Finally, on July 10, 2007, Johnson was arrested for the unauthorized use of Prieto's credit cards.  (*Id.*, at 997-98, 1666, 1714.)  In response to questioning, Johnson eventually told police that he had received the credit cards from Petitioner.  (*Id.*, at 1023-25.)

At about 5:00 p.m. on July 10, 2007, a New Jersey officer and five NYPD officers, including Detective Daniel Casey, traveled to Petitioner's workplace in New Jersey.  (*Id.*, at 197-99.)  When Petitioner arrived at the lounge area where the officers were waiting, Detective Casey

---

[5] Petitioner's DNA was on file because he was a registered sex offender in New Jersey. (*Id.* at 95.)

inquired whether Petitioner would accompany them back to Manhattan to assist with an ongoing investigation.  (*Id*., at 200-01)  Detective Casey testified that Petitioner "was a gentleman," and that he willingly agreed to be transported to the 13th Precinct in Manhattan.  (*Id*.)  Detective Casey further stated that Petitioner did not inquire as to the nature of the investigation (*id*., at 203), and that the officers never stated that Petitioner was under arrest or that he was required to accompany them back to New York (*id*., at 206).

When Petitioner and the NYPD officers arrived at the 13th Precinct, Detective Casey handcuffed Petitioner, brought him inside, and informed the officer at the front desk that he was bringing in "a body."  (*Id*., at 204-05.)  The officers then placed Petitioner in an interview room and removed his handcuffs.  (*Id*., at 205).  At about 9:40 p.m., NYPD Detectives Randall Roca and Theodore Wozniak entered the interview room, informed Petitioner that they "were conducting a credit card investigation," and read Petitioner his *Miranda* rights from a preprinted form.  (*Id*., at 18-19.)  Petitioner initialed and signed the preprinted form, indicating that he understood his *Miranda* rights, and agreed to be questioned without an attorney present.  (*Id*., at 18-20.)

In response to questioning, Petitioner denied that he was in possession of any credit cards or checks that did not belong to him.  (*Id*., at 21, 109-10.)  Petitioner indicated that he would be willing to make a written statement to that effect, and, after Detective Wozniak wrote out the statement, Petitioner reviewed and signed it.  (*Id*., at 21, 110-12.)

Later, while Petitioner was searching for his employer's business card, Detective Roca noticed that Petitioner was carrying several papers in his wallet.  (*Id*., at 21-23, 112.)  Detective Roca asked if he could look through the wallet, and Petitioner agreed.  (*Id*., at 22-23, 112-13.)  Inside the wallet was a piece of paper containing Prieto's telephone number and an address that

almost exactly matched Prieto's address.[6]  (*Id.*, at 23, 114-15.)  Petitioner acknowledged that the handwriting on the paper was his, but he stated that he did not recognize the phone number or address.  (*Id.*, at 23-24, 117-19.)

       After further questioning, Detective Roca showed Petitioner a photograph of Prieto and asked if Petitioner recognized him.  (*Id.*, at 25, 117.)  Petitioner stated that the man in the photograph resembled a client whom he had driven to Kennedy Airport while working as a taxi driver.  (*Id.*, at 25, 117-18.)  When Detective Roca asked if Petitioner had ever been inside Prieto's apartment, Petitioner stated that he had gone up the elevator to collect luggage, but had never entered the apartment itself.  (*Id.*, at 25, 118)  At that point, the detectives showed Petitioner a photograph of himself sitting inside Prieto's apartment.  (*Id.*, at 25-26, 119-20.)  Upon viewing the photograph of himself, Petitioner "became upset and advised that he did not like where this was going."  (*Id.*, at 26.)  The detectives then informed Petitioner that they had listened to messages on Prieto's answering machine left by Petitioner, and that historical cell-site information showed that Petitioner was in the vicinity of Prieto's apartment on May 14, 2007.  (*Id.*, at 26, 120-21.)  Petitioner then requested an attorney and stated that he did not wish to continue the interview.  (*Id.*, at 26-27, 121.)  At that time, detectives informed Petitioner that he was being placed under arrest.  (*Id.*, at 27.)

---

[6] Prieto's address was 145 East 35th Street, Apartment 8ME.  (*Id.* at 23, 115.)  The paper found in Petitioner's wallet bore the address 145 East 33rd Street, Apartment 8ME.  (*Id.*)

B.    **Procedural History**

1.    **Pretrial Rulings**

a.    **Motion To Suppress Evidence Obtained**
**Pursuant to Allegedly Unlawful Arrest**

On July 15 and 16, 2008, a pretrial *Mapp*/*Dunaway*/*Huntley*/*Wade* hearing was held

before the Honorable Thomas Farber, J.S.C., in the Supreme Court of New York, New York

County.[7]  (App'x, at 1-254.)  At the close of testimony, Petitioner argued that, on July 10, 2007,

NYPD detectives had unlawfully arrested him at his workplace in New Jersey and then

transported him to New York, and that all statements made by him and evidence seized from him

as a result of this arrest should be suppressed.  (*Id*., at 222-30.)  Petitioner contended that a

reasonable person in his position, who was innocent of any crime, would have understood that he

was not free to refuse the officers' requests when they arrived at his workplace in New Jersey.

(*Id*., at 2118-21.)  Petitioner further argued that, by arresting him in New Jersey and immediately

transporting him to New York, the NYPD detectives intentionally violated New Jersey's "Fresh

Pursuit" statute, under which out-of-state law-enforcement officers can enter New Jersey in

"fresh pursuit" of a suspect and make a felony arrest in that state, provided that, upon such arrest,

the officers then bring the arrestee before a "neighboring magistrate" (*i.e*., a local judge) without

unnecessary delay, for a determination as to the lawfulness of arrest and the necessity of

---

[7] This hearing was held pursuant to:  (1) *Mapp v. Ohio*, 367 U.S. 643 (1961), to
determine whether physical evidence sought to be used against Petitioner was obtained illegally;
(2) *Dunaway v. New York*, 442 U.S. 200 (1979), to determine whether there was probable cause
for Petitioner's arrest; (3) *People v. Huntley*, 15 N.Y.2d 72 (1965), to determine whether any
statements made by Petitioner should be suppressed; and (4) *United States v. Wade*, 388 U.S.
218 (1967), to determine whether Petitioner's pretrial identification was the result of
impermissibly suggestive procedures.

detaining the arrestee until an extradition warrant is issued.  (*See id*, at 2121-22; N.J. Stat. §§ 2A:155-4, 2A:155-5.)

By Order dated January 29, 2008, the hearing court denied Petitioner's suppression motion.  (App'x, at 2126-36.)  First, the court found that Petitioner was not in custody at the time that he was transported to the New York police precinct.  (*Id*., at 2132-33.)  The court further determined that Petitioner was given *Miranda* warnings prior to any custodial interrogation, that the waiver of his *Miranda* rights was knowing, voluntary, and intelligent, and that Petitioner freely and voluntarily gave detectives permission to look through his wallet.  (*Id*., at 2135-36.)  The court therefore denied Petitioner's motion to suppress the physical evidence and statements obtained on July 10, 2007.  (*Id*., at 2136.)

### b.      Motion To Suppress Historical Cell-Site Information

On February 13, 2009, Petitioner moved before the trial court to suppress all documents and testimony pertaining to the location of cell sites or towers accessed by Petitioner's cell phone, on the grounds that:  (1) New York's "pen register" and "trap and trace" statutes did not permit the release of such information; (2) the SCA did not authorize the release of such information; and (3) the acquisition of such evidence without a showing of probable cause violated Petitioner's federal and state constitutional rights.  (*Id*., at 2162-82.)  Petitioner further argued that, unless the trial court ruled outright that such evidence should be suppressed, a *Frye* hearing would be required to determine whether evidence regarding the likely location of Petitioner's cell phone at certain points in time should nonetheless be deemed inadmissible.  (*Id*., at 2190-92.)  On June 10, 2009, the trial court issued an oral ruling denying Petitioner's motion to suppress and request for a *Frye* hearing (*id*., at 260-61), and, on July 17, 2009, the court issued a written decision memorializing that ruling (*id*., at 2195-99).  In that decision, the court held that

the SCA authorized disclosure of historical cell-site data and that, because Petitioner had no reasonable expectation of privacy in cell-phone records that were maintained by a third party, his Fourth Amendment rights were not violated by the seizure of such records. (*Id.*, at 2198-99.)

<strong>c.      Ruling on Admissibility of Decedent's Hearsay Statements</strong>

At a court appearance on June 10, 2009, the trial court ruled on two additional pretrial motions that relate to Petitioner's current habeas claims. (*Id.*, at 258-522.) First, the prosecution sought a ruling confirming the admissibility of certain statements attributed to Prieto by two of his friends, Richard DeLong ("DeLong") and Michael Dillon ("Dillon"), both of whom were expected to testify at trial. (*Id.*, at 295-343.) Through these witnesses, the prosecution planned to offer evidence regarding aspects of Prieto's relationship with Petitioner that each witness had claimed to learn about through conversations with Prieto. Specifically, Prieto had purportedly informed each of these witnesses that he was "having problems" with Petitioner, that Petitioner had stolen his credit cards, that Petitioner had been making several phone calls and unannounced visits to Prieto, and that Prieto was frightened of Petitioner and wanted to end the relationship. (*Id.*, at 297-99, 308-09.)

On June 12, 2009, the trial court ruled that such statements were not inadmissible hearsay because they reflected Prieto's then-existing state of mind and negated any suggestion that Petitioner had permission to use Prieto's credit card and checks or was voluntarily admitted into Prieto's apartment. (*Id.*, at 472-74.) The court further reasoned that this "background information" was "inextricably interwoven" with the narrative of the case and provided the "arguable motivation" for the crime. (*Id.*, at 474-65, 485.)

### d.     *Sandoval* **Ruling**

At the June 10, 2009 court appearance, Petitioner also sought an advance *Sandoval* ruling from the court as to whether the prosecution could use evidence of his prior criminal acts for impeachment purposes.  (*Id*., at 370-87.)  In particular, the prosecution stated that it intended to ask Petitioner about the facts of his 2003 New Jersey conviction for Endangering the Welfare of a Child in the Third Degree, which had involved his sexual assault of his three-year-old granddaughter.  (*Id*., at 373-74.)  The trial court ruled that the prosecution could bring out the fact that Petitioner had been convicted of Endangering the Welfare of a Child, under circumstances involving inappropriate sexual contact, without inquiring into the specific facts of the case.  (*Id*., at 385-86.)  Petitioner requested that the court reconsider the aspect of the *Sandoval* ruling that permitted the elicitation of facts regarding the conviction's sexual character, arguing that the prejudicial impact of such information outweighed its probative value.  (*Id*., at 386-87.)  The trial court declined to reconsider, stating that it was "the sexual contact aspect of [the conviction] that really ma[de] it probative" as to Petitioner's credibility, and that the limitation on inquiring about the specific facts underlying the conviction struck the appropriate balance between probative value and prejudicial impact.  (*Id*., at 387.)  Petitioner did not testify at trial, and the jury therefore never learned of his prior conviction.

### 2.     **Trial**

Among the witnesses who took the stand at trial were two of Prieto's friends (DeLong and Dillon), Petitioner's "nephew" (Johnson), and a medical examiner who testified as an expert witness.  As relevant to Petitioner's habeas claims, the testimony of these witnesses is summarized below.

### a.       **Testimony of DeLong and Dillon**

DeLong testified that he had known Prieto since 1973 (*id*., at 650), and that Prieto had confided in him regarding his relationship with Petitioner (*id*., at 650-51).  Prieto told DeLong that he had given Petitioner gifts, such as clothing or shoes, and that, on one occasion, he had purchased a car for Petitioner.  (*Id*., at 651.)  Later, according to DeLong, Prieto became upset when Petitioner traded in that car for a Mercedes, believing that he could end up being responsible for payments that Petitioner could not afford.  (*Id*., at 652.)  DeLong also testified that, on February 23, 2007, he met Prieto for dinner to celebrate Prieto's birthday.  (*Id*.)  DeLong stated that, despite the celebratory occasion, he had never seen Prieto "so obviously upset."  (*Id*.)  Prieto informed DeLong that Petitioner had stolen his credit cards and that Prieto was frightened that "there m[ight] be some violence involved."  (*Id*., at 653.)  As Prieto was afraid to travel alone to his apartment, DeLong walked him home and waited in the hall until Prieto had "checked the apartment out."  (*Id*.)  After that meeting, Prieto informed DeLong that he would no longer answer Petitioner's telephone calls or allow Petitioner into his apartment.  (*Id*., at 655.)

Dillon testified that he and Prieto had been friends from 1965 until the time of Prieto's death (*id*., at 892-93), and that he was aware that Prieto had maintained a romantic relationship with Petitioner from the early to mid-1990s until 2007 (*id*., at 895).  Prieto also told Dillon that he had given Petitioner money and gifts, and that he was unhappy after Petitioner traded in the car that Prieto had purchased for him for a more expensive vehicle.  (*Id*., at 895-96.)  In 2007, Prieto expressed to Dillon that he was dissatisfied with his relationship with Petitioner and wanted to end it, because he felt that "his money was being drained."  (*Id*.)  Dillon testified that, at some point, Prieto informed him that Petitioner had stolen Prieto's credit cards and had attempted to make a purchase at a mall in New Jersey.  (*Id*., at 897.)  Prieto also told Dillon that

11

Petitioner had threatened him over the phone, and that he was scared to return to his apartment. (*Id*., at 898.)  Dillon spoke to Prieto on May 13, 2007 (a date close in time to Prieto's death), and testified that he thought he remembered that, during that conversation, Prieto had reiterated that he was afraid of Petitioner.  (*Id*., at 899-900.)

### b.   Testimony of Johnson

Johnson testified that, while he was not related to Petitioner by blood, he had known Petitioner for his entire life and considered Petitioner to be his uncle.  (*Id*., at 972.)  On May 14, 2007, while Johnson was working as a livery cab driver, Petitioner called to ask Johnson to pick him up.  (*Id*., at 975-76.)  After Johnson declined, Petitioner called him several more times, but Johnson ignored his calls.  (*Id*., at 976.)  Finally, Johnson answered the phone, learned that Petitioner was in New Jersey, near the entrance to the Lincoln Tunnel, and agreed to pick up Petitioner at that location.  (*Id*., at 976-77.)  When Petitioner entered the vehicle, Johnson observed red spots on his shirt, and Petitioner stated that he had been in a fight and broken someone's nose.  (*Id*., at 977-79.)  During that encounter, Petitioner gave Johnson several credit cards; Johnson did not remember the names on these cards, but stated that Petitioner told him that the billing address was 145 East 35th Street, New York, New York.  (*Id*., at 979-82, 989-90.)

On May 15, 2007, Johnson used the credit cards at a jewelry store.  (*Id*., at 983.)  When Johnson returned to the store around one day later, he saw two police officers viewing security camera footage.  (*Id*., at 992.)  Later, Johnson's dispatcher called to inform him that "people in suits" were looking for him at his place of employment.  (*Id*., at 992-93.)  When he arrived at home, Johnson's wife informed him that the person whose credit cards Petitioner had given him had been murdered.  (*Id*., at 993.)  After that conversation, Johnson "panicked" and "took off for a little while."  (*Id*.)  Upon returning home, Johnson saw Petitioner standing outside.  (*Id*., at

994.)  Johnson asked Petitioner, "What happened?  My wife said you killed somebody."  (*Id*.)  In response, Petitioner said, "Shit happens," and gave Johnson a "dirty look."  (*Id*.)

Johnson was arrested in July of 2007, and both he and Petitioner were incarcerated at Rikers Island.  (*Id*., at 1028.)  When Johnson and Petitioner were briefly detained in the same bullpen, the two spoke about Prieto's murder.  (*Id*., at 1029.)  Johnson testified that Petitioner "told [him] exactly what he did, that he knocked a guy over the head with a fire extinguisher . . . [and] used a butter knife to cut his neck."  (*Id*.)[8]

### c.  Testimony of Dr. Peter Lin, Medical Examiner

The prosecution also called Dr. Peter Lin, a medical examiner who was employed by the City of New York and was qualified as an expert in the field of forensic pathology.  (*Id*., at 1370-73.)  On May 17, 2007, Dr. Lin performed an autopsy of Prieto (*id*., at 1376); his testimony at trial addressed his autopsy findings and his expert opinion as to the cause of Prieto's death.  Ultimately, Dr. Lin opined that Prieto's death was caused by either blunt force trauma to the head or compression of the neck.  (*Id*., at 1446.)  As the sequence of events could not be determined, and both types of injuries were severe enough to cause death, Dr. Lin's autopsy report listed both blunt impacts to the head and compression of the neck as the causes of death.  (*Id*.)

---

[8] In addition to Johnson, two other witnesses also testified that Petitioner had admitted to the murder.  Denise Doherty ("Doherty"), Petitioner's ex-girlfriend, stated that Petitioner told her that he killed a man with a fire extinguisher after going to the home of a friend named "Raul" to rob him.  (*Id*. at 1305-07.)  Larry Emmons ("Emmons"), who had been charged with drug offenses and testified pursuant to a plea agreement, stated that while he and Petitioner were incarcerated at Rikers Island, Petitioner stated that he had murdered a man by hitting him with a fire extinguisher, suffocating him with a pillow, and – to the best of Emmon's recollection – either strangling him or slitting his throat.  (*Id*. at 853-54.)

With respect to Prieto's head injuries, Dr. Lin stated that the autopsy revealed "extensive" and "innumerable" skull fractures, as well as injuries to the brain. (*Id.* 1382, 1395.) Given the nature of Prieto's blunt-impact injuries, which he described as "non-specific," Dr. Lin opined that Prieto was struck with a "very large amount of force," and that the murder weapon could have been "any object with a flat or rounded surface," including the fire extinguisher recovered from Prieto's apartment. (*Id.*, at 1396-97.)

Dr. Lin also noted a more distinctive, rectangular-shaped laceration, however, on the right side of Prieto's head. (*Id.*, at 1392.) While he noted that it is "very difficult" to match a particular pattern injury on the skin to the particular object that caused that injury, Dr. Lin recounted that he had examined the fire extinguisher and had shown the fire extinguisher to "a number of other medical examiners," in an effort to determine whether the fire extinguisher could have caused the rectangular laceration. (*Id.*, at 1392-93.) Petitioner's counsel objected to that portion of the testimony, and, after the objection was overruled, Dr. Lin testified: "We, basically, came to the conclusion that it's possible that the fire extinguisher caused that pattern laceration, specifically, the handle region of it. But . . . it wasn't a perfect match, and there were some assumptions that would have had to have been made for the fire extinguisher to have caused that pattern laceration." (*Id.*, at 1393.) In response to questions from the trial court, Dr. Lin clarified that this was his own conclusion as an expert and that it was not unusual for him to discuss difficult cases with other medical examiners. (*Id.*)

At the conclusion of Dr. Lin's direct examination, Petitioner moved for a mistrial, on the ground that the court had permitted the witness to testify as to the medical opinions of certain colleagues whom Petitioner had no opportunity to cross-examine. (*Id.*, at 1399.) The trial court denied the motion for a mistrial, noting that the issue was not critical and that the court's follow-

14

up questions clarified that Dr. Lin was testifying only as to his own opinion.  (*Id*., at 1401.)

Moreover, the court offered to issue a curative instruction informing the jury that the witness was

only entitled to testify as to his own opinion, and not that of his colleagues.  (*Id*.)  Petitioner's

counsel stated that he was "in no way" withdrawing the objection or his motion for a mistrial

(*id*., at 1402), and he declined the trial court's offer to give a curative instruction (*id*., at 1447).

### d.      Request for Circumstantial-Evidence Charge

At the close of trial, Petitioner requested that the trial court issue a circumstantial-

evidence instruction.  (*Id*., at 1880.)[9]  The court noted its view that the "confession evidence"

constituted the sole direct evidence of Petitioner's guilt, but stated that, in light of that evidence,

it was prepared to instruct the jury as to the definitions of direct and circumstantial evidence

without giving the full circumstantial-evidence instruction.  (*Id*., at 1882.)  Petitioner's counsel

objected on the ground that, as Petitioner had not admitted each element of the charged crime,

---

[9] The full circumstantial evidence charge contained in the New York Criminal Jury
Instructions defines both direct and circumstantial evidence, giving examples of each.  *See*
Circumstantial Evidence, New York Criminal Jury Instructions, Second Edition, *available at*
http://www.nycourts.gov/judges/cji/1-General/cjigc.shtml.  The instruction then explains what is
required before the jury can return a verdict of guilty based solely on circumstantial evidence,
stating:

> After you have determined what facts, if any, have been proven beyond a
> reasonable doubt, then you must decide what inferences, if any, can be
> drawn from those facts.  Before you may draw an inference of guilt,
> however, that inference must be the only one that can fairly and
> reasonably be drawn from the facts, it must be consistent with the proven
> facts, and it must flow naturally, reasonably, and logically from them.
> Again, it must appear that the inference of guilty is the only one that can
> fairly and reasonably be drawn from the facts, and that the evidence
> excludes beyond a reasonable doubt every reasonable hypothesis of
> innocence.  If there is a reasonable hypothesis from the proven facts
> consistent with the defendant's innocence, then you must find the
> defendant not guilty.

*Id*.

15

his admission could not be properly characterized as a confession; for this reason, Petitioner's

counsel argued that the crime could not be proven based on direct evidence in the record, and the

complete circumstantial-evidence instruction should be given.  (*See id.*, at 1882.)  Ultimately, the

judge instructed the jury on reasonable doubt and the difference between circumstantial and

direct evidence (*id.*, at 2000-02, 2055-61), but did not give the jury the full circumstantial-

evidence charge requested by Petitioner (*id.*, at 2000-02).[10]

### e.      <u>Verdict and Sentencing</u>

On July 2, 2009, the jury found Petitioner guilty of Murder in the Second Degree, under

N.Y. Penal Law § 125.25(1).  (*Id.*, at 2093-95.)  Petitioner was sentenced, on July 17, 2009, to

the maximum sentence of 25 years to life.  (*Id.*, at 2111; *see* N.Y. Penal Law § 70.00.)

### 3.      <u>Appeal</u>

Petitioner filed a timely notice of appeal (App'x, at 2212), and, on July 11, 2011, he filed

an appellate brief, through counsel, raising six claims:  (1) that officers had unlawfully arrested

_____

[10] The trial court instructed the jury:

> Before you may draw an inference of guilt from circumstantial evidence,
> you must conclude that the inference flows naturally, reasonably, and
> logically from the credible evidence, that it is consistent with that
> evidence, and that it is not produced by strained reasoning or guesswork.
> Ultimately, in this case, where the People rely on a combination of both
> [circumstantial and direct evidence], you must carefully analyze all of the
> evidence and determine whether or not the People have met their burden
> of proving each of the elements of the crime charged, beyond a reasonable
> doubt.

(App'x, at 2002.)  On appeal, Petitioner argued that this charge, unlike the
circumstantial evidence instruction contained in the New York Criminal Jury
Instructions, did not include language stating that a jury cannot reach an inference
of guilt unless the evidence excludes every reasonable hypothesis of innocence,
such that the inference of guilt is the only one that can be fairly drawn from the
facts.  (*Id*. at 2301.)

Petitioner in New Jersey, without bringing him before a local judge, in order to subvert his constitutional right to counsel, and that the hearing court therefore should have suppressed the evidence and statements derived from that arrest; (2) that the admission of historical cell-site information, in the absence of statutory authority, a warrant based on probable cause, or a *Frye* hearing to determine if expert testimony regarding such evidence was reliable, violated Petitioner's rights under the Fourth Amendment, the SCA, and New York state law; (3) that out-of-court statements of the decedent were erroneously admitted, in violation of the hearsay rule and Petitioner's due-process rights, and that out-of-court statements of the medical examiner's colleagues were admitted in violation of the hearsay rule and the Confrontation Clause of the Sixth Amendment; (4) that the trial court abused its discretion in making a *Sandoval* ruling that denied Petitioner's request that any reference to his 2003 conviction for Endangering the Welfare of a Child not contain any reference to sexual contact; (5) that the trial court's failure to give a circumstantial-evidence charge violated Petitioner's right to a fair trial; and (6) that the maximum sentence of 25 years to life was harsh and excessive in light of Petitioner's age and the fact that the homicide was not premeditated.  (*Id.*, at 2213-14.)

By decision dated March 8, 2012, the Appellate Division, First Department, unanimously affirmed Petitioner's conviction.  (*Id.*, at 2468-69; *People v. Sorrentino*, 939 N.Y.S.2d 452 (1st Dep't 2012).)  With respect to Petitioner's claim regarding the statements and evidence seized as a result of his arrest, the appellate court concluded that there was no basis to disturb the hearing court's finding that Petitioner was not under arrest until after he arrived in New York.  (App'x, at 2468.)  The appellate court further affirmed the hearing court's determination that, even if the New Jersey "Fresh Pursuit" statute had been violated, suppression would not have been required.  (*Id.*, at 2469.)  In addition, the Appellate Division held that the hearing court had properly denied

Petitioner's motion to suppress historical cell-site location data, on the ground that such records were obtained pursuant to a valid court order in compliance with the SCA.  (*Id.*)  The court further stated that the introduction of such evidence did not violate the state or federal constitutions, and that, "given the People's evidentiary showing, the order was effectively a warrant."  (*Id.*)

The Appellate Division also found that the trial court properly exercised its discretion in denying Petitioner's mistrial motion, made by Petitioner after the medical examiner testified regarding the opinions of other forensic examiners who were not present at the trial.  (*Id.*) Without specifically indicating whether it was addressing Petitioner's hearsay claim or the Confrontation Clause violation that allegedly arose from the claimed evidentiary error, the appellate court reasoned that the medical examiner's brief reference to his colleagues' opinions could not have caused any prejudice "given the overwhelming evidence of . . . guilt," and that, in any event, the trial court's proposed curative instruction would have been sufficient to remove such prejudice, had Petitioner not declined that remedy and insisted on seeking a mistrial.  (*Id.*) The Appellate Division also found that the trial court had "providently exercised its discretion in admitting the decedent's statements to his friends about his deteriorating relationship with [Petitioner], including his intention to terminate the relationship and stay away from [Petitioner]."  (*Id.*)  While not explicitly distinguishing between Petitioner's hearsay and due-process claims relating to the admission of Preito's statements, the Appellate Division further found that, "in any event, any error [resulting from the introduction of such statements] was harmless."  (*Id.*)  Finally, the Appellate Division found no basis for reducing Petitioner's sentence, and stated that it had "considered and rejected [Petitioner's] remaining claims."  (*Id.*)

By letter dated April 6, 2012, Petitioner, through counsel, sought leave to appeal to the New York Court of Appeals.  (*Id.*, at 2470-71 (Application for Leave to Appeal, dated Apr. 6, 2012).)  He also requested the opportunity to file a supplemental letter that would address the reasons why the Court of Appeals should review his claims, phrasing that request as follows:

> Nicholas Sorrentino respectfully prays for the issuance of a certificate . . . granting permission to appeal and certifying that there is a question of law in the above-entitled case which ought to be reviewed by the Court of Appeals.  . . . .
>
> . . . .  Mr. Sorrentino respectfully requests the opportunity to file a supplemental letter with the Judge to whom this matter is assigned, addressing in greater detail the reasons why the Court should review his case and how the issues are preserved for this Court's review.
>
> Copies of the Appellate Division's order and the briefs submitted below are enclosed.

(*Id.*, at 2470.)

On May 2, 2012, Petitioner proceeded to file a supplemental letter, in which he explicitly requested that the Court of Appeals review five out of the six claims that he had raised before the Appellate Division; the letter did not address Petitioner's claim that his sentence was excessive. (*Id.*, at 2472-81 (Letter Supplementing Application for Leave to Appeal, dated May 2, 2012).) On July 10, 2012, the Court of Appeals denied Petitioner's application for leave to appeal.  (*Id.*, at 2493; *People v. Sorrentino*, 19 N.Y.3d 977 (2012).)

### 4.    Federal Habeas Corpus Petition

On October 3, 2012, proceeding *pro se*, Petitioner commenced this action for habeas corpus relief by filing a petition under 28 U.S.C. § 2254.[11]  (*See generally* Pet.)  In the Petition,

---

[11] Under the so-called "prison mailbox rule," *see Houston v. Lack,* 487 U.S. 266, 270, (1988), a *pro se* prisoner's habeas petition is deemed filed on the date he gives it to prison officials for delivery to the Court, *see Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir. 2001), *cert.*

Petitioner appears to raise the same six grounds for relief that he argued in his brief on direct appeal.[12]

On April 3, 2013, Respondent filed an answer and memorandum of law in opposition to the Petition.  (Resp. Answer and Mem.)  On April 4, 2013, Respondent filed an Appendix that contained the relevant state court record.  (Dkt. 13 (docket notation reflecting Court's receipt of Appendix).)[13]  On July 18, 2013, Petitioner filed an affidavit and memorandum of law in reply to Respondent's opposition.  (Affidavit in Reply to Respondent's Opposition to Writ of Habeas Corpus, dated July 8, 2013 (Dkt. 14).)

## DISCUSSION

## I.      APPLICABLE LEGAL STANDARDS

### A.      Statute of Limitations

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a habeas petition must be filed within a one-year limitations period beginning on the latest of four dates, usually "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A); *see also Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner

---

*denied*, 534 U.S. 886.  Here, the affidavit of service that Petitioner included with the Petition states that the Petition was "submitted" and "served" on October 3, 2012 (*see id.*, at 48), and thus the Court will consider that to have been its filing date.

[12] As Petitioner is proceeding *pro se*, this Court construes the Petition to raise the strongest grounds for habeas relief that it suggests.  *See Bell v. Ercole*, 631 F. Supp. 2d 406, 413 (S.D.N.Y. 2009) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)).

[13] *See supra*, at n.3.

elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via certiorari").[14]  The limitations period is tolled for "the time during which a properly filed application for State post-conviction or other collateral review" is pending.  28 U.S.C. § 2244(d)(2).

### B.    Exhaustion of State Judicial Remedies

A federal court generally may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); *see Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997).  To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his or her federal claims to the state courts, thereby affording those courts the "initial opportunity to pass upon and correct alleged violations of [the petitioner's] federal rights."  *Picard*, 404 U.S. at 275 (internal quotation marks and citation omitted).

The petitioner must also have presented those claims to "the highest court of the pertinent state."  *Larocco v. Senkowski*, 65 F. App'x 740, 742 (2d Cir. 2003) (summary order) (internal quotation marks and citations omitted); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995).  To accomplish this in New York, on direct appeal, a petitioner must first appeal his or her conviction to the Appellate Division and then "seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal."  *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005).  A federal habeas court will find the

---

[14] The limitations period may alternatively begin to run on the following dates:  (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence.  *See* 28 U.S.C. § 2244(d)(1)(B)-(D).

exhaustion requirement to be satisfied with respect to a particular claim where the "fair import" of the "total application" to the Court of Appeals suggests a request for review of that claim. *Id.* at 75-76.

The submission of appellate briefs along with a letter requesting leave to appeal is sufficient to exhaust all of the claims that were fairly presented to the Appellate Division. *Id.* at 76 (citing *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)). By contrast, if a petitioner's application for leave to appeal argues some of the issues that were contained in his or her appellate brief, but ignores other claims that were before the Appellate Division, the claims that are not identified in the application for leave to appeal are deemed to have been abandoned, and thus not presented to the Court of Appeals. *Id.* at 74-75; *Grey*, 933 F.2d at 120 ("The fair import of petitioner's submission to the Court of Appeals, consisting of his brief to the Appellate Division that raised three claims and a letter to the Court of Appeals arguing only one of them, was that the other two had been abandoned."). This is the case even where an application that argues some claims at length attaches an appellate brief containing additional claims, but does not expressly alert the Court of Appeals that review of those additional claims is being sought. *See Batts v. Artuz*, 254 F. App'x 855, 856 (2d Cir. 2007) (citing *Jordan v. Lefevre*, 206 F.3d 196, 198-99 (2d Cir. 2000), and stating, "[I]n [*Jordan*], we held that a habeas petitioner had procedurally defaulted those claims contained in his Appellate Division briefs but omitted in his letter to the New York Court of Appeals by stating, in that letter, nothing beyond his request for leave to appeal '[f]or all of these reasons and the reasons set forth in his Appellate Division briefs.' Here, Batts did even less by attaching his briefs, making no reference at all to them, and discussing only one unrelated claim.").

C.     **Standard of Review Under AEDPA**

If a petitioner's federal constitutional claim has been adjudicated on the merits by the

state court, then the federal court must accord substantial deference to the state court's decision

under the standard of review dictated by AEDPA.  *See* 28 U.S.C. § 2254(d); *Sellan v. Kuhlman*,

261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision

finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the

claim advanced, rather than on a procedural, or other, ground").  The relevant section of AEDPA

provides that

> [a]n application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim – (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d).

Under AEDPA, a state court's decision is contrary to clearly established federal law

where the state court either applies a rule that contradicts governing law set forth in Supreme

Court precedent, or "confronts a set of facts that are materially indistinguishable from a

[Supreme Court] decision" and arrives at a different result.  *Williams v. Taylor*, 529 U.S.

362, 405-06 (2000).  An unreasonable application of clearly established federal law occurs when

the state court identifies the correct governing legal principle, but unreasonably applies that

principle to a "set of facts different from those of the case in which the principle was

announced."  *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003).  The state court's decision "must

have been more than incorrect or erroneous"; rather, "[t]he state court's application must have

23

been 'objectively unreasonable.'"  *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting

*Williams*, 529 U.S. at 409).  In order to be entitled to habeas relief, the petitioner must show that

"the state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement."  *Harrington v. Richter*, 131 S. Ct. 770, 786-87

(2011).

In addition, under AEDPA, where not manifestly unreasonable,  a state court's factual

findings are presumed correct, and can only be overcome by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

## II.  THE PETITION SHOULD BE DISMISSED.

As a threshold matter, this Court finds that the Petition was timely filed.  On July 10,

2012, the New York Court of Appeals denied Petitioner's request for leave to appeal from the

Appellate Division's affirmance of his conviction.  *See People v. Sorrentino*, 19 N.Y.3d 977

(2012).  Accordingly, his conviction became final for AEDPA purposes 90 days later, on

October 8, 2012.  *See Williams*, 237 F.3d at 150; *see also Epps v. Poole*, 687 F.3d 46, 49 (2d Cir.

2012) (noting 90-day period for filing petition for writ of certiorari).  As the Petition was filed

just four days later, on October 12, 2012, the Petition is timely.  Nevertheless, for the reasons set

forth below, I recommend the dismissal of each of Petitioner's habeas claims.

### A.  Ground One:  Admission of Evidence and Statements Obtained Pursuant to July 10, 2007 Arrest

In his first stated ground for habeas relief, Petitioner alleges that NYPD detectives

violated his rights when they arrested him in New Jersey and then transported him to New York,

without first bringing him before a local judge, as required by New Jersey's "Fresh Pursuit"

statute.  (Pet., at 7-12; *see* N.J. Stat. § 2A:155-5.)  Petitioner states that the NYPD officers

intentionally violated that statute, in order "to subvert his constitutional right to counsel" (which would have been triggered by the judicial proceeding), and that the trial court erred when it denied his motion to suppress all evidence seized and statements made during this arrest.  (Pet., at 7.)  On appeal, Petitioner also argued that the denial of his motion to suppress violated his 14th Amendment right to a fair trial.  Although the Petition does not specifically identify which constitutional right is now being invoked in connection with this habeas claim, Petitioner's challenge to the admission of evidence obtained during his allegedly unlawful arrest does not provide a basis for habeas relief, regardless of whether his claim is grounded in the Fourth Amendment's protection against unlawful arrest, the Sixth Amendment's guarantee of counsel, or the 14th Amendment's due-process protections.  Nor can a claimed violation of state law provide a basis for such relief.

### 1.     Claims for Violations of the Fourth and 14th Amendments

On direct appeal, Petitioner specifically invoked his Sixth Amendment right to counsel and 14th Amendment right to a fair trial in arguing that the evidence seized pursuant to his allegedly unlawful arrest should have been suppressed.  (App'x, at 2260-64.)  Petitioner did not, however, contend that the admission of such evidence violated his rights under the Fourth Amendment.  Thus, to the extent that his *pro se* Petition can be construed to assert such a claim, *see Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005) (holding that the Fourth Amendment governs both arrest and actions taken for some period following initial act of physical restraint), that claim is procedurally barred, as Petitioner did not exhaust the claim in state court and no longer has any means to do so.  *See, e.g.*, *Grey*, 933 F.2d at 120-21; *see also* N.Y. Crim. Proc. Law § 440.10(2)(c) (barring collateral review of claims that could have been raised on direct appeal); *People ex rel. Flemming v. Rock*, 972 N.Y.S.2d 901, 901 (1st Dep't

2013) (state writ of habeas corpus unavailable where claim could have been raised on direct appeal (citations omitted)).  Moreover, for the reasons set forth below, any Fourth Amendment claim that Petitioner may be asserting would be meritless, and Petitioner therefore cannot show any prejudice arising from the procedural default.  *See McDowell v. Heath*, No. 09 Civ. 7887 (RO) (MHD), 2013 WL 2896992, at *25 (S.D.N.Y. June 13, 2013) ("Petitioner also cannot establish actual prejudice [as would be necessary to overcome a procedural default] because this . . . claim has no merit."); *Grullon v. United States*, No. 04 Civ. 7144 (SAS), 2006 WL 559668, at *7 (S.D.N.Y. Mar. 8, 2006) ("[Petitioner] has not shown any prejudice because he has failed to demonstrate that his [claim] would succeed on the merits.").

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that, where a state "has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Id*. at 494.  Under *Powell*, a state petitioner may obtain federal habeas review of a Fourth Amendment claim only if:  (1) the state provides no corrective procedures to redress Fourth Amendment violations; or (2) the petitioner was precluded from utilizing such corrective procedures by an "unconscionable breakdown in that process."  *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977).  Further, to the extent that Petitioner claims that the denial of the suppression motion violated his 14th Amendment right to a fair trial, rather than his rights under the Fourth Amendment (*see* App'x, at 2264 (raising 14th Amendment claim in Petitioner's appellate brief)), such claims are still foreclosed under the rule set out in *Powell, see Young v. Graham*, No. 6:11-CV-6481 (MAT), 2012 WL 2789707, at *3 (W.D.N.Y. July 9, 2012) ("Although Petitioner has couched his claim in terms of a fair trial violation and a denial of equal protection, it essentially raises a Fourth Amendment issue which

26

is barred from habeas review unless the state denied Petitioner a full and fair opportunity to litigate that claim.").

Here, Petitioner sought suppression of the evidence obtained through his allegedly unlawful arrest through pretrial suppression proceedings (App'x, at 1-254, 2113-26), and on appeal (*id*., at 2254-64).  While Petitioner did not base his challenge to the introduction of such evidence on the Fourth Amendment, the combined *Mapp*/*Dunaway*/*Huntley*/*Wade* hearing clearly presented him with a full and fair opportunity to raise any such claim.  *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002) ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure) . . . the claim will never present a valid basis for federal habeas relief."); *Capellan v. Riley*, 975 F.2d 67, 70 n.1 (2d Cir. 1992) ("[T]he federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate." (internal quotation marks and citation omitted)).  Furthermore, the Petition contains no facts suggesting that an unconscionable breakdown in the suppression proceedings denied Petitioner a full and fair opportunity to litigate any Fourth or 14th Amendment violations arising from the allegedly unlawful arrest or the subsequent admission of physical evidence and statements.  Thus, Petitioner may not obtain habeas relief based on the trial court's failure to exclude such evidence.

### 2.   Claims for Violations of New Jersey "Fresh Pursuit" <br> Statute and the Sixth Amendment Right to Counsel

As "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," it is well-settled that "federal habeas corpus relief does not lie for errors of state law."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).  For this reason, even if the NYPD officers who arrested

Plaintiff did violate New Jersey law by transporting him to New York without first bringing him before a local judge, the fact of the state-law violation would not constitute grounds for habeas relief.  *See Vasquez v. Walker*, No. 01 Civ. 8032 (AKH), 2004 WL 594646, at \*4 (S.D.N.Y. Mar. 2004) ("Violations of state statutory rights are not reviewable by federal habeas courts.").

Furthermore, Petitioner's argument that detectives intentionally violated New Jersey law in order to circumvent his Sixth Amendment right to counsel cannot transform this state-law issue into a federal constitutional question.  *See Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002) ("[N]ot every error of state law can be transmogrified by artful argumentation into a constitutional violation." (internal quotation marks and citation omitted)).  In *McCray v. Ercole*, No. 07 Civ. 6589 (DAB) (GAY), 2010 WL 6804661 (S.D.N.Y. Dec. 16, 2010), *adopted by* 2011 WL 2496232 (S.D.N.Y. June 22, 2011), a habeas petitioner made a nearly identical argument, contending that police officers intentionally violated a state extradition statute, so as to delay the attachment of his Sixth Amendment right to counsel until after the initiation of police questioning, when they failed to present him before a local judge immediately upon his arrest.  *Id*. at \*2-3.  The court found that a federal habeas petition was not the appropriate vehicle to raise such issues, because any Sixth Amendment claim would be "inextricably tied" to the requirements of the state extradition statute.  *Id*. at \*3.

The reasoning of *McCray* is persuasive.  To conduct an inquiry into whether NYPD officers intentionally subverted Petitioner's Sixth Amendment rights by ignoring New Jersey's "Fresh Pursuit" statute, this Court would necessarily have to reexamine the New York state courts' determination that the officers did not avoid the requirements of that state statute. (App'x, at 2135, 2468.)  "This is precisely the type of inquiry that is outside the province of federal habeas review."  *McCray*, 2010 WL 6804661, at \*3 (citing *McGuire*, 502 U.S. at 68).  In

any case, the hearing court's finding that Petitioner was not in custody until after he arrived in

New York must be presumed correct under AEDPA, and Petitioner has not offered clear and

convincing evidence showing that this factual determination was erroneous.  *See* 28 U.S.C.

§ 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003) ("Factual determinations by state

courts are presumed correct absent clear and convincing evidence to the contrary.").

      For these reasons, Petitioner's argument that he was unlawfully arrested in New Jersey

and transported to New York for the purpose of subverting his right to counsel does not provide

a basis for granting habeas relief.  Accordingly, I recommend that Petitioner's first habeas claim

be dismissed in its entirety.

      **B.**     **Ground Two:  Admission of Historical Cell-Site Location Data**

      Petitioner's second ground for habeas relief is that the trial court should have suppressed

evidence and expert testimony regarding the location of cell sites accessed by Petitioner's cell

phone on certain dates in May 2007.  (Pet., at 14-22.)  Petitioner argues that such evidence was

obtained:  (1) in violation of his constitutional rights under the Fourth Amendment; and

(2) without statutory authority under either state or federal law.  (*Id.*, at 14.)  In addition,

Petitioner states that the trial court further erred when it admitted such evidence without first

conducting a *Frye* hearing.  (*Id.*, at 15.)

      **1.**     **Fourth Amendment Claim**

      First, as set forth above, the admission of evidence seized in violation of the Fourth

Amendment does not provide a ground for habeas relief, as long as the petitioner was afforded a

full and fair opportunity to litigate any Fourth Amendment claims in the state courts.  *See Stone*,

428 U.S. at 494.  In this case, Petitioner raised his claims regarding the cell-site evidence in a

pretrial motion to suppress (App'x, at 2162-99), and on direct appeal (*id.*, at 2265-80), and the

Petition contains no facts suggesting that this process did not provide Petitioner with a full and

fair opportunity to litigate the Fourth Amendment issue.  Thus, to the extent that Petitioner's

challenge to the admission of historical cell-site information is grounded in the Fourth

Amendment, he cannot obtain habeas relief on this basis.

2.  <u>**Claims for Statutory Violations**</u>

Petitioner argues that the release of cell-site location information was not authorized

under the SCA because use of this data rendered his cell phone a "tracking device."[15]  (Pet., at

18-19; 18 U.S.C. § 2510(12)(C) (excluding communications by a tracking device from coverage

under the SCA).)  Where a habeas claim is premised on a federal statute, rather than the

Constitution, relief is available only if the alleged violation is "a fundamental defect which

inherently results in a complete miscarriage of justice."  *Reed v. Farley*, 512 U.S. 339, 354

(1994) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)); *see also Medellin v. Dretke*,

544 U.S. 660, 664 (2005) (noting that a violation of federal statutory rights is not cognizable in a

postconviction proceeding unless the "fundamental defect" test is satisfied).  Furthermore, as the

New York courts resolved Petitioner's SCA claims on the merits (App'x, at 2195-99, 2469),

AEDPA's deferential standard of review applies to this Court's review of their decisions with

respect to such claims, *see* 28 U.S.C. § 2254(d).  Thus, to obtain habeas relief on this claim,

Petitioner must demonstrate both:  (1) that the alleged SCA violation was a "fundamental

defect," and (2) that New York courts' adjudication of Petitioner's challenge to the admission of

historical cell-site information was contrary to, or an unreasonable application of, Supreme Court

precedent regarding the interpretation of the SCA.  *See Medellin*, 544 U.S. at 664-65 (stating that

---

[15] To the extent that Petitioner also bases his challenge on the New York state "pen register" or "trap and trace" statutes, his claim is not cognizable on federal habeas review.  *See McGuire*, 502 U.S. at 67 ("[F]ederal habeas corpus relief does not lie for errors of state law.").

habeas petitioner seeking relief for nonconstitutional violation must meet fundamental defect test and also overcome deferential standard of review under AEDPA).

As Petitioner cannot satisfy either of these requirements, his claim that the historical cell-site location data was obtained in violation of the SCA, and thus should have been suppressed, must be dismissed. First, the SCA explicitly provides that a person aggrieved by a violation of the statute may bring a civil action for certain appropriate relief and that these remedies are the exclusive "judicial remedies and sanctions for nonconstitutional violations" of the SCA. 18 U.S.C. §§ 2707-08. For this reason, suppression of evidence is not an available remedy for an SCA violation. *See United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998) ("[T]he Stored Communications Act expressly rules out exclusion as a remedy."); *United States v. Ferguson*, 508 F. Supp. 2d 7, 10 (D.D.C. 2007) ("Even if Defendant was correct that the Government did not comply with the SCA, the statute does not provide for a suppression remedy."). In light of this, it would be difficult for the Court to conclude that a violation of the SCA (assuming a violation occurred) could have amounted to a fundamental defect, such that the admission of historical cell-site information at trial resulted in a complete miscarriage of justice. *Reed*, 512 U.S. at 354. Second, Petitioner points to no Supreme Court precedent establishing that a cell phone is a tracking device or that 18 U.S.C. § 2703(d) does not authorize the release of historical cell-site data. *Cf. Wearing v. Lavalley*, No. 10-CV-8307 (JPO), 2015 WL 6738327, at *25 (S.D.N.Y. Nov. 4, 2015) (noting lack of controlling authority on the question of whether the SCA "authorize[s] the issuance of an order requiring the disclosure of historical cell site information."). Absent such authority, Petitioner cannot meet the AEDPA standard for habeas relief, *see* 28 U.S.C. § 2254(d), based on any claimed violation of the SCA.

3.      **Claim Based on State Evidentiary Ruling**

Petitioner's claim that the trial court should have held a *Frye* hearing before admitting

evidence regarding historical cell-site information also does not provide a basis for federal

habeas relief.  The purpose of a *Frye* hearing is only to determine whether expert testimony and

evidence has gained general acceptance in the scientific community and is therefore admissible

under New York law.  *See Perez v. Graham*, No. 13 Civ. 1428 (WHP) (GWG), 2014 WL

523409, at *9 (S.D.N.Y. Feb. 5, 2014), *report and recommendation adopted by* 2014 WL

805958 (S.D.N.Y. Feb. 28, 2014).  This is a state evidentiary matter wholly separate from the

question of whether the admission of such evidence violates the federal Constitution.  *Id*.  In

general, mere errors of state evidentiary law are not cognizable on habeas review.  *See* 28 U.S.C.

§ 2254(a); *see also McGuire*, 502 U.S. at 68 ("In conducting habeas review, a federal court is

limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United

States." (citations omitted)); *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) ("[S]tate trial court

evidentiary rulings generally are not a basis for habeas relief.").

For his claim to be cognizable in this habeas proceeding, Petitioner would have to

demonstrate not only that the trial court's decision to admit historical cell-site data without

conducting a *Frye* hearing was erroneous, but also that this error violated an identifiable

constitutional right and deprived him of a "fundamentally fair trial."  *See Zarvela v. Artuz*, 364

F.3d 415, 418 (2d Cir. 2004) (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988));

*Velazquez v. Fischer*, 524 F. Supp. 2d 443, 450 (S.D.N.Y. 2007).  In so doing, Petitioner would

"bear[] a heavy burden because evidentiary errors generally do not rise to constitutional

magnitude."  *Copes v. Schriver,* No. 97 Civ. 2284 (JGK), 1997 WL 659096, at *3 (S.D.N.Y.

Oct. 22, 1997) (citation omitted).

In this instance, Petitioner does not identify in the Petition (Pet., at 20) – and similarly did not identify in his state appellate brief (App'x, at 2280-82) – any federal constitutional right that was violated by the trial court's failure to conduct a *Frye* hearing.  Rather, Petitioner has consistently framed this argument in state-law terms alone.  For this reason, any federal due-process claim that Petitioner may now be seeking to raise regarding the denial of a *Frye* hearing must be considered unexhausted and procedurally barred, *see Romero v. Rock*, No. 08 Civ. 7791 (PAC) (FM), 2011 WL 1467238, at *6 (S.D.N.Y. Apr. 18, 2011) (finding that evidentiary claims were record-based, and thus procedurally barred where they were not raised on appeal), and the Petition provides no facts suggesting cause for the lack of exhaustion or prejudice sufficient to overcome the procedural bar, *see Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (holding that habeas review of a procedurally defaulted claim is barred unless the petitioner can show cause for the default and actual prejudice arising from the alleged federal violation).  In any event, as Petitioner has not even attempted to demonstrate that the denial of a *Frye* hearing was an error of constitutional magnitude, Petitioner has not shown that this alleged state-law error gives rise to a claim that is cognizable on federal habeas review.

For all of these reasons, Petitioner's second claim for habeas relief, relating to the state court's admission of historical cell-site location data, should be dismissed in its entirety.

### C.   Ground Three:  Admission of Hearsay Statements

Petitioner's third habeas claim is that two categories of statements made by out-of-court declarants were erroneously admitted into evidence.  First, Petitioner states that, by permitting Prieto's friends, DeLong and Dillon, to testify regarding statements purportedly made by Prieto before his death, the trial violated the hearsay rule; liberally construed, the Petition may also be read to assert that this error constituted a violation of Petitioner's constitutional due-process

rights.[16]  (*See* Pet., at 26-31.)  Second, Petitioner argues that, by permitting the medical

examiner, Dr. Lin, to testify improperly about the medical opinions of his colleagues, the trial

court again violated the hearsay rule, as well as Petitioner's rights under the Confrontation

Clause of the Sixth Amendment.  (*Id.*, at 23-26.)

### 1.   Statements of Decedent

As discussed above, errors of state evidentiary law are not cognizable on habeas review,

*see* 28 U.S.C. § 2254(a); *McGuire*, 502 U.S. at 68, and thus erroneously admitted hearsay

statements cannot provide a basis for federal habeas relief unless the evidentiary error so

undermined the fairness of the trial as to violate the petitioner's constitutional right to due

process, *see Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (noting that erroneous evidentiary

ruling would not rise to the level of constitutional error unless it deprived the petitioner of a

fundamentally fair trial (citing *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973))); *see also*

*Smith v. Conway*, No. 06 Civ. 7674 (RMB) (KNF), 2007 U.S. Dist. LEXIS 89579, at *18-19

(S.D.N.Y. Dec. 6, 2007) (noting that, even if the trial court erroneously allowed hearsay

evidence, the "evidentiary ruling . . . may provide a basis for habeas corpus relief only if

[Petitioner] establishes that it so infused the trial with unfairness as to deny due process of law"

(internal quotation marks and citation omitted)), *report and recommendation adopted by* 2008

U.S. Dist. LEXIS 22750 (S.D.N.Y. Mar. 24, 2008).

In order to demonstrate that the trial court's admission of supposed hearsay rendered his

trial constitutionally infirm, a petitioner must be able to show that the ruling not only constituted

---

[16] Although the Petition does not specifically assert that the introduction of hearsay statements made by Prieto violated Petitioner's 14th Amendment right to a fair trial, Petitioner raised that argument on direct appeal (App'x, at 2283), and, in light of Petitioner's *pro se* status and his reference to his appellate arguments, this Court construes the Petition to raise the identical claim here.

error, but also that the erroneously admitted evidence "was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Smith v. Grenier*, 117 F. App'x 779, 781 (2d Cir. 2004) (quoting *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985)).  Accordingly, in determining whether the introduction of a particular hearsay statement violated a petitioner's constitutional right to due process, a habeas court must conduct a two-part analysis that inquires:  (1) whether the trial court's evidentiary ruling was erroneous under state law, and (2) whether the error deprived the petitioner of the constitutional right to a fundamentally fair trial.  *Kotler v. Woods*, 620 F. Supp. 2d 366, 392 (E.D.N.Y. 2009); *Nowlin v. Greene*, 467 F. Supp. 2d 375, 380 (S.D.N.Y. 2006).

In this case, Petitioner argued on his direct appeal – both in his brief to the Appellate Division and in his letter seeking leave to appeal to the New York Court of Appeals – that his 14th Amendment due-process rights were violated by the trial court's admission of testimony by which witnesses purported to recount statements made by Prieto before his death.  To the extent Petitioner seeks to raise that constitutional claim here, it is thus exhausted, and, as it was rejected by the Appellate Division on the merits (*see* App'x, at 2469),[17] this Court must consider the

---

[17] As noted above (*see* Background, *supra*, at Section B(3)), the Appellate Division did not make explicit whether it was addressing Petitioner's state-law evidentiary claim or his federal due-process claim in determining that "any error" with respect to the trial court's admission of this evidence "was harmless" (App'x, at 2469).  Yet, even if this aspect of the court's decision related only to Petitioner's state-law claim, the appellate court must still be said to have rejected Petitioner's related, federal claim on the merits, given its further statement that it had "considered and rejected" Petitioner's remaining claims.  (*Id.*; *see Jones v. Cuomo*, 254 F. App'x 6, 7 (2d Cir. 2007) ("As there is no basis . . . for believing that the claim at issue was denied on procedural or any other nonsubstantive grounds, the Appellate Division's terse statement that [the petitioner's] arguments had been 'considered and rejected' suffices to trigger AEDPA deference." (internal quotation marks and citations omitted)); *Ancrum v. Fischer*, No. 02 Civ. 2568 (LAP) (DF), 2003 WL 21976397, at *2 (S.D.N.Y. Aug. 19, 2003) ("Courts in this district have subsequently found that the phrase 'considered and rejected' and similar phrases are sufficient to trigger the AEDPA's deferential standard of review.").)

claim under AEDPA's deferential standard.  On the record presented, Petitioner cannot meet that standard, as, at bottom, even if the trial court's admission of the challenged statements made by Prieto constituted evidentiary error, the court's ruling cannot be said to have deprived Petitioner of a fundamentally fair trial.

While the statements in question may arguably have identified the motive for Prieto's murder, they were not so material as to provide the basis for conviction or remove a reasonable doubt that would otherwise have existed.  Indeed, the prosecution presented a substantial amount of strong evidence, including DNA evidence showing that Petitioner's DNA was present on the presumed murder weapon (App'x, at 1814-16), historical cell-site information demonstrating that Petitioner was in the vicinity of Prieto's apartment on the date of the murder (*id*., at 1132-48, 1202-1223, 1568-72), Petitioner's possession of credit cards and checks that had belonged to Prieto (*id*., at 979-82, 1024-25), false exculpatory statements that Petitioner made to NYPD detectives during questioning (*id*., at 109-12), and the testimony of three witnesses – Johnson, Doherty, and Emmons – who all maintain that Petitioner admitted to killing Prieto (*id*., at 853-54, 1028-29, 1305-07; *see also supra*, at n.8).  In light of the overwhelming evidence of Petitioner's guilt, any evidentiary error that did result from the introduction of Prieto's hearsay statements did not deprive Petitioner of a fair trial.

Accordingly, Petitioner has not presented a cognizable federal claim based on the asserted evidentiary error.  *See, e.g.*, *Brown v. Breslin*, Nos. 02-CV-6044 (JBW), 03-MISC-0066 (JBW), 2003 U.S. Dist. LEXIS 22468, at *19 (E.D.N.Y. Nov. 26, 2003) (habeas relief, sought on the ground that trial court made an evidentiary error, was denied where evidence of Petitioner's guilt was strong and evidentiary error did not have a substantial and injurious effect on the trial) (internal quotation marks and citation omitted)).  Certainly, in light of the strength of the other

evidence presented by the prosecution at trial, there is no basis for this Court to conclude that the Appellate Division's rejection of Petitioner's asserted due-process claim was contrary to, or an unreasonable application of, established federal law.  *See* 28 U.S.C. § 2254(d).

### 2.   Statements of Medical Examiner

Under the Confrontation Clause of the Sixth Amendment, a criminal defendant has "the right . . . to be confronted with the witnesses against him."  U.S. Const. Amend. VI.  The Supreme Court has held that the Confrontation Clause is violated when an out-of-court declarant's testimonial statement is admitted against a criminal defendant, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination.  *See Crawford v. Washington*, 541 U.S. 36, 68 (2004).  Thus, admission of testimonial statements regarding the results of forensic analysis is not permitted in a criminal trial, unless the defendant has the opportunity to confront the individual whose analysis or conclusions are offered into evidence.  *See Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009).

Even when the Confrontation Clause has been violated, however, a writ of habeas corpus must not issue if the error was harmless.  *See Bowen v. Phillips*, 572 F. Supp. 2d 412, 419 (S.D.N.Y. 2008) (citing *Fuller v. Gorczyk,* 273 F.3d 212, 220 (2d Cir. 2001); *Mingo v. Artuz,* 174 F.3d 73, 78 (2d Cir. 1999)).  In a habeas proceeding, a federal court must assess the prejudicial impact of a constitutional error under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which provides that "an error is harmless unless it 'had a substantial and injurious effect or influence in determining the jury's verdict,'" *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht*, 507 U.S. at 631).  The factors to be considered in harmless-error analysis include:  (1) the importance of the witness' testimony in the prosecution's case; (2) whether the

testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case.  *See Brinson v. Walker*, 547 F.3d 387, 395 (2d Cir. 2008) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).  Of these factors, the overall strength of the prosecution's case is "probably the single most critical factor."  *Perkins v. Herbert*, 596 F.3d 161, 177 (2d Cir. 2010) (quoting *United States v. Reifler*, 446 F.3d 65, 87 (2d Cir. 2006)).  Accordingly, in the habeas context, "[f]ederal courts commonly hold alleged Confrontation Clause violations to be harmless error when the evidence against the petitioner at trial was substantial and/or the improperly admitted testimony was cumulative of other admissible evidence."  *Bowen*, 572 F. Supp. 2d at 419 (citing *Ruiz v. Kuhlmann*, 80 F. App'x 690, 694 (2d Cir. 2003)); *see also Perkins*, 596 F.3d at 177-78 (holding that petitioner did not suffer prejudice where erroneously admitted evidence was cumulative of properly admitted evidence and remaining evidence of guilt was strong).

In this instance, Petitioner claims that, by permitting Dr. Lin to testify regarding the opinions of other medical examiners, who were not available for cross-examination, the trial court violated Petitioner's Confrontation Clause rights.  Petitioner exhausted this claim on his direct appeal (*see* App'x at 2283-88, 2479), and the Appellate Division denied the claim on the merits (*see* Background, *supra*, at Section B(3)), finding, *inter alia*, that Petitioner had failed to demonstrate that the claimed error had caused him prejudice (*see* App'x, at 2469).  This determination by the state court was neither contrary to, nor represented an unreasonable application of federal law, 28 U.S.C. § 2254(d), given that, even if Petitioner is correct that there was a Confrontation Clause violation here under *Crawford*, an evaluation of the relevant factors

compels the conclusion that such a violation did not have a substantial and injurious effect on the jury's verdict, and was therefore harmless, *Brecht*, 507 U.S. at 623.

As noted by the Appellate Division, "the offending testimony consisted, essentially, of a single use of the word 'We' instead of 'I.'" (App'x, at 2469; *Sorrentino*, 939 N.Y.S.2d at 454.) To the extent that the use of the plural pronoun buttressed the strength of Dr. Lin's own opinion by showing that he shared that opinion with his non-witness colleagues, the trial court attempted to limit any impermissible inferences by clarifying that Dr. Lin was testifying to his own expert conclusions and offering to give a curative instruction, which Petitioner declined.  (App'x, at 1447.)  While cross-examination of Dr. Lin's colleagues was impossible, Petitioner was otherwise able to question Dr. Lin regarding the strength and supportability of his own expert opinion.  Moreover, regardless of whether it was impermissibly buttressed, Dr. Lin's testimony that the handle of the fire extinguisher could potentially have made a particular rectangular laceration was of little importance to the prosecution's case.  Indeed, there was overwhelming evidence that the fire extinguisher was, in fact, the murder weapon:  there was a stain on it that included blood and a mixture of DNA from both Petitioner and Prieto (*id*., at 1829-30); Dr. Lin testified that any of its round or flat surfaces could have caused Prieto's brain injuries and "innumerable" skull fractures (*id*., at 1397); and three witnesses testified that Petitioner had actually admitted that he used a fire extinguisher to kill Prieto (*id*., at 853-54, 1028-29, 1305-07). The question of whether the fire extinguisher *also* caused a particular patterned laceration, or whether a second weapon was used in addition to the fire extinguisher, was of minimal

importance.  This is particularly true in light of the other strong evidence of Petitioner's guilt.
(*See* Discussion, *supra*, at Section II(C)(1).)[18]

For these reasons, any constitutional claim arising from the trial court's admission of
Dr. Lin's testimony cannot succeed, and, accordingly, I recommend that Petitioner's third habeas
claim be dismissed in its entirety.

## D.      **Ground Four:  *Sandoval* Ruling**

For his fourth habeas claim, Petitioner asserts that the trial court abused its discretion
when it ruled that, if Petitioner took the stand, the prosecution could elicit testimony from him
that he had a prior conviction for Endangering the Welfare of a Child, and that this prior crime
had involved sexual conduct.  (Pet., at 33-37.)  On direct appeal, Petitioner argued that this
*Sandoval* ruling violated his 14th Amendment right to a fair trial (App'x, at 2300), and this Court
liberally construes the Petition to raise the same constitutional claim.  Even if exhausted,
however, the claim cannot succeed in this Court, as Petitioner's decision not to testify at trial
effectively bars the claim from habeas review.

The "admission of prior convictions for the purpose of impeaching the defendant has
been characterized as evidentiary in nature," and an erroneous *Sandoval* ruling therefore is "not
redressable in a federal habeas corpus proceeding absent a showing that the particular errors
were of constitutional magnitude."  *Blackman v. Ercole*, No. 06 Civ. 855 (SLT) (SMG), 2009
WL 4891767, at *7 (E.D.N.Y. Dec. 17, 2009) (quoting *Jenkins v. Bara,* 663 F. Supp. 891, 899
(E.D.N.Y. 1987)); *Peterson v. Greene*, Nos. 06 Civ. 41 (GEL), 06 Civ. 811 (GEL), 2008 WL

---

[18] To the extent that Petitioner also claims that the introduction of hearsay statements
made by the other medical examiners violated his due-process right to a fair trial, the strength of
the prosecution's evidence further demonstrates that the hearsay statements were not
"sufficiently material to provide the basis for conviction or to remove a reasonable doubt that
would have existed on the record without it."  *Smith*, 117 F. App'x at 781.

2464273, at *5 (S.D.N.Y. June 18, 2008) (noting that a *Sandoval* ruling is "primarily a matter of state evidence law").  Not only has Petitioner failed to cite any Supreme Court law holding that an erroneous *Sandoval* ruling can rise to the level of a constitutional violation where the defendant does not take the stand, but the most relevant Supreme Court authority suggests the contrary, and courts in this Circuit have repeatedly held that, in such circumstances, no constitutional violation may be found.

In an analogous context, the Supreme Court has held that the erroneous admission of evidence of prior convictions for impeachment purposes, under Rule 609(a) of the Federal Rules of Evidence, is a ruling that generally does "not reach[] constitutional dimensions."  *Luce v. United States,* 469 U.S. 38, 41-43 (1984).  Furthermore, in *Luce,* the Court held that, to preserve the issue for direct appellate review, the federal defendant must have *actually testified* at trial. *Id*. at 41.  "Otherwise, any harm that the defendant faced is 'wholly speculative.'"  *Walton v. Ricks*, No. 01 Civ. 5265, 2002 WL 32009795, at *10 (S.D.N.Y. Mar. 19, 2002), *report and recommendation adopted by* 2003 WL 1873607 (S.D.N.Y. Jan 31, 2003).  This doctrine has been extended by this Court to the habeas context and "repeatedly applied" to federal review of similar, state-court *Sandoval* rulings.  *Mercado v. Phillips*, No. 04 Civ. 2204 (GBD) (MHD), 2011 WL 1157617, at *6 (S.D.N.Y. Feb. 22, 2011) (collecting cases), *report and recommendation adopted by* 2011 WL 1157570 (S.D.N.Y. Mar. 29, 2011).  Indeed, courts in this Circuit apply "a bright-line rule . . . barring habeas relief for allegedly erroneous *Sandoval* rulings in instances where a defendant elects not [to] testify."  *Melendez v. LaValley*, 942 F. Supp. 2d 419, 424 (S.D.N.Y. 2013) (quoting *Shannon v. Senowski,* No. 00 Civ. 2865 (NRB), 2000 WL 1683448, at *6 (S.D.N.Y. Nov. 9, 2000)).  "It is well-settled that a petitioner's failure to testify at trial is fatal to any claims of constitutional deprivation arising out of a *Sandoval*-type

ruling," because "absent such testimony, a court has 'no adequate non-speculative basis upon which to assess the merits of that claim.'"  *Shannon,* 2000 WL 1683448, at *6 (quoting *McEachin v. Ross*, 951 F. Supp. 478, 481 (S.D.N.Y. 1997) (citation omitted)); *see also Ciochenda v. Artus*, No. 06 Civ. 5057 (PAC) (GWG), 2009 WL 1026018, at *6 (S.D.N.Y. Apr. 9, 2009) ("When a defendant does not take the stand, he cannot challenge the trial court's ruling regarding impeachment evidence.").

Petitioner chose not to testify at trial.  Accordingly, his *Sandoval* claim, regardless of whether it has been cast as a federal constitutional claim, cannot be redressed in a federal habeas proceeding.  I therefore recommend that Petitioner's claim that the trial court's *Sandoval* ruling deprived him of his 14th Amendment right to a fair trial be dismissed.

### E.       Ground Five:  Circumstantial-Evidence Instruction

For his fifth habeas claim, Petitioner argues that his constitutional right to a fair trial was violated when the trial court failed to issue a circumstantial-evidence instruction to the jury. (Pet., at 38-40.)  Petitioner states that such an instruction was required because there was no direct evidence establishing the required element of intent.  (*Id.*)  Petitioner exhausted this claim on his direct appeal (*see* App'x, at 2301-03, 2480), but he cannot prevail on it here, as a trial court's failure to issue a circumstantial-evidence charge cannot provide a basis for federal habeas relief.

As an initial matter, the propriety of a particular jury instruction is a matter of state law. *See Perez v. Grenier*, No. 00 Civ. 5504 (RCC) (KNF), 2005 WL 613183, at *6 (S.D.N.Y. Mar. 14, 2005).  For that reason, a petitioner's challenge to jury instructions is subject to federal habeas review only if the alleged error deprived him or her of a federal constitutional right.  *See Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001) ("[I]n order to obtain a writ of habeas corpus

in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law."); *Griffin v. N.Y. State Dep't of Corr.*, No. 06 Civ. 14217 (GEL), 2007 WL 1296203, at *2 (S.D.N.Y. May 2, 2007) (citing *Cupp v. Naughten*, 414 U.S. 141, 146 (1973) ("Challenges to state court jury instructions are not reviewable on habeas corpus absent a showing that the alleged errors were so serious as to have deprived the defendant of a fair trial.")).

There is, however, no constitutional requirement that a state court issue a circumstantial-evidence instruction to the jury, even where the evidence presented is purely circumstantial. *See Parisi v. Artus*, No. 08-CV-1785 (ENV), 2010 WL 4961746, at *4 (E.D.N.Y. Dec. 1, 2010) ("There is no federal constitutional right to a circumstantial evidence charge."); *Griffin*, 2007 WL 1296203, at *2 ("There is no constitutional right to a special jury instruction when a case is founded on circumstantial evidence.").  "Indeed, far from there being any federal law requiring the kind of instruction that [Petitioner] seeks, there is Supreme Court authority suggesting that the sort of instruction sought by [Petitioner] may be 'incorrect.'"  *Schachter v. Fischer*, No. 05 Civ. 9896 (RCC) (GWG), 2007 WL 404773, at *7 (S.D.N.Y. Feb. 7, 2007) (citing *Holland v. United States*, 348 U.S. 121, 139 (1954)), *report and recommendation adopted by* 2007 WL 4591978 (S.D.N.Y. Dec. 26, 2007).  Thus, regardless of whether New York law requires a court to issue a particular circumstantial-evidence instruction under the set of facts present in this case, the failure to issue such an instruction does not implicate any federal constitutional right.  I therefore recommend that Petitioner's fifth habeas claim be dismissed.

F.     **Ground Six:  Excessive Sentence**

Petitioner's sixth and final stated ground for habeas relief is that his sentence of 25 years to life is harsh and excessive.  (Pet., at 41-43.)  In this regard, Petitioner argues that the homicide was not a premeditated act and that imposition of even the minimum prison term of 15 years to life would have resulted in his not becoming eligible for parole until the age of 76.  (*Id.*, at 41.)  For the reasons set forth below, this claim must be dismissed.

As a threshold matter, based on the procedural history of Petitioner's direct appeal, as set out above, it appears that Petitioner may have abandoned this excessive-sentence claim in his application for leave to appeal to the state Court of Appeals, and that the claim should therefore be considered unexhausted.  Specifically, Petitioner argued six grounds – essentially, the same six grounds now raised in his habeas Petition – in the brief he submitted to the Appellate Division.  (App'x, at 2212-2311, 2434-67.)  When Petitioner then submitted an application for leave to appeal to the Court of Appeals, he attached copies of the Appellate Division's decision and his appellate briefs.  (*Id.*, at 2470-71.)  He did not, however, ask that the Court of Appeals review all claims contained in the attached briefs; rather, he only requested the opportunity to file a supplemental letter at a later date.  (*See id.*)  In the supplemental letter that he submitted thereafter, Petitioner argued at length that the Court of Appeals should review his claims regarding the admission of historical cell-site location information (*id.*, at 2472-79), and additionally argued that the Court should consider:  (1) the admission of evidence obtained pursuant to an allegedly unlawful arrest; (2) the admission of hearsay testimony; (3) the trial court's *Sandoval* ruling; (4) the trial court's failure to issue a circumstantial-evidence instruction; and (5) the trial court's refusal to conduct a *Frye* hearing regarding the admission of scientific evidence regarding the geographic range of cellular towers (*id.*, at 2480).  Petitioner's

44

supplemental letter made no mention, though, of his excessive-sentence claim.  (*See generally id*., at 2472-81.)  Given that Petitioner raised an excessive-sentence claim before the Appellate Division, but then failed to address that claim in his submission to the Court of Appeals, despite the fact that he addressed each of the other claims from his appellate brief, Petitioner's excessive-sentence claim was, at least arguably, abandoned.  *See Jordan*, 206 F.3d at 198-99; *see also Butler v. Heath*, No. 12 Civ. 3327 (SAS) (DF), 2015 WL 3403926, at *10 (S.D.N.Y. Feb. 18, 2015) (deeming sufficiency-of-evidence claim abandoned where the petitioner filed an initial request for leave to appeal that did not identify any particular claims, but merely enclosed his appellate briefs, then later filed a supplemental letter detailing his arguments in support of certain other claims, without addressing any claim regarding the sufficiency of the evidence), *report and recommendation adopted by* 2015 WL 3403926 (S.D.N.Y. May 22, 2015); *Inesti v. New York*, No. 13 Civ. 6351 (WHP) (JCF), 2014 WL 2069645 (S.D.N.Y. Apr. 23, 2014) (finding that claims not raised in a supplemental letter were abandoned, where the petitioner had first submitted his appellate briefs along with an initial letter that did not specifically identify the claims upon which the petitioner sought leave to appeal), *report and recommendation adopted by* 2014 WL 2069645 (S.D.N.Y. May 14, 2014).

        In any event, Petitioner's excessive-sentence claim is plainly meritless.  First, the Petition does not cite any federal law in support of this claim (*see* Pet., at 41-42), and Petitioner's argument on this point before the Appellate Division relied exclusively on state law, as well (App'x, at 2304-10).  To the extent Petitioner's excessive-sentence claim is grounded in state law, it is not cognizable on federal habeas review.  *See McGuire*, 502 U.S. at 68; *see also Bell v. Ercole*, 631 F. Supp. 2d 406, 418 (S.D.N.Y. 2009) ("[Petitioner] contends that his sentence of fourteen years of imprisonment was excessive and should be reduced in the interest of justice.

45

To the extent that this claim relies on state law principles, it is not cognizable on federal habeas review.").

Second, in order to state a federally cognizable excessive-sentence claim, a habeas petitioner must generally allege that the statute under which he was sentenced was itself unconstitutional, under the Eighth Amendment, *see United States v. Dawson*, 400 F.2d 194, 200 (2d Cir. 1968) ("when a statute provides for punishment thought to be violative of the [Eighth] [A]mendment the constitutionality of the statute itself must be attacked" (citations omitted)), and Petitioner has made no such attack on the validity of the relevant statute.

Third, in the absence of a challenge to the relevant statute itself, an excessive-sentence claim may only be maintained if the sentence imposed fails to comply with state law. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." (citation omitted)). A sentence that is within the range permitted by state law, like the sentence at issue here, *see* N.Y. Penal Law § 70.00, may not be held to be disproportionate under the Eighth Amendment. *Pinero v. Grenier*, 519 F. Supp. 2d 360, 371 (S.D.N.Y. 2007); *see also Echevarria-Perez v. Burge*, 779 F. Supp. 2d 326, 337 (W.D.N.Y. 2011) (noting that, under the sentencing provisions of N.Y. Penal Law § 70.00, the maximum sentence for second degree murder is 25 years to life). Moreover, the Supreme Court has ruled that "no sentence of imprisonment would be disproportionate" for the crime of felony murder, which does not require the specific intent to kill. *Harmelin v. Michigan*, 501 U.S. 957, 1004 (1991) (quoting *Solem v. Helm*, 463 U.S. 277, 290 n.15 (1983)). *A fortiori*, Petitioner's sentence of 25 years to life for Second-Degree Murder, in violation of N.Y. Penal Law § 125.25(1) – a crime that *does* require the "intent to cause the death of another person" – cannot have been disproportionate to Petitioner's conduct.

46

For these reasons, any Eighth Amendment claim that Petitioner may now be seeking to assert would necessarily be meritless.  I therefore recommend the dismissal of Petitioner's claim that his sentence was excessive.

## CONCLUSION

For all of the foregoing reasons, I recommend that the Petition be dismissed in its entirety.  I further recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), as Petitioner has not made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail).  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Vernon S. Broderick, United States Courthouse, 40 Foley Square, New York, New York 10007, Room 415, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Broderick.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBEJCTIONS AND WILL PRECULDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

If Petitioner does not have access to cases cited herein that are reported only on Westlaw or LEXIS, he may request copies from Respondent's counsel.  *See* Local Civ. R. 7.2 ("Upon

request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities that are unpublished or reported exclusively on computerized databases that are] cited in a decision of the Court and were not previously cited by any party").

Dated: New York, New York
February 3, 2016

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Mr. Nicolas Sorrentino
09-A-3902
Clinton Correctional Facility
P.O. Box. 2001
Dannemora, NY 12929

Respondent's counsel (via ECF)